### THOMSON–HOUSTON ELECTRIC CO. v. LORAIN STEEL CO.

(Circuit Court, S. D. New York. August 1, 1901.)

**1. PATENTS—ANTICIPATION—ESTOPPEL.**

The fact that, on the citation by the patent office of a prior foreign patent as an anticipation, the applicant relied solely on the ground that such patent was not an anticipation of his invention, does not estop him, when the foreign patent is pleaded in defense to a subsequent suit for infringement, from carrying the date of his invention back to antedate such patent.

**2. SAME—PRIOR PUBLIC USE.**

The inventor of a commutator brush for use on electric motors. more than two years prior to his application for a patent, used a brush having the essential features of that described in the patent on a motor used to propel a car or carrier with which he was experimenting, and which was run at intervals during several months along a cable stretched over a vacant lot adjoining his factory in a city, and was exhibited to visitors. The experimenting had relation to the car, and not to the brushes. *Held* that, as to the brushes, it was a practical public use which rendered the patent invalid.

**3. SAME—COMMUTATOR BRUSHES.**

The Van Depoele patent, No. 390,921, for an improvement in commutator brushes or contacts, the essential feature of which is the use of carbon as the material for such brushes, *held* void for prior public use.

In Equity. Suit for infringement of the first claim of letters patent No. 390,921, issued to Charles J. Van Depoele October 9, 1888. On final hearing.

Frederick P. Fish and Kerr, Page & Cooper, for complainant.
Richard Eyre, for defendant.

LACOMBE, Circuit Judge. The specification states that the "invention relates to improvements in commutator brushes or contacts for use with dynamo-electric generators and electro-dynamic motors. In the operation of electric motors, it is desirable for various reasons to use a thick brush or contact, held by suitable mechanism in position tangential to the surface of the commutator; that is, projected endwise against it. [Concededly the word "tangential" is a misuse for "radial," which the context shows was intended.] In

these positions the brushes may be moved around the commutator to any desired position without in the least affecting their mechanical relation thereto, and it has been usual to use thick bunches of thin copper laminæ, secured together at their outer ends, for this purpose; but I find in practice that the leaves of brushes so constructed will get into the interstices or separations between the sections of the commutator, by the rotation of which the leaves of which the brush is composed will be gradually bent outward and away from each other, and so in a short time rendered useless. This difficulty I have overcome by substituting for the copper contact brushes heretofore used brushes or contacts of carbon or other nonhomogeneous substance, which, being porous, will in a short time take up a quantity of copper dust and form a smooth wearing face that is extremely durable." After a reference to the drawings the specification proceeds:

"My improved brushes consist of plates or pieces of carbon shaped to fit loosely within the boxes or holders where they are placed, and then securely held in position against the commutator by the tension of suitable springs, to be referred to. The carbon brushes or contacts, A, may be of any desirable length or shape, according to circumstances; the particular shape and size or proportion herein shown being merely for the sake of illustration. The lower ends of the brushes should be formed or molded to fit the surface of the commutator; the subsequent wear being sufficient to retain the shape originally given."

After setting forth the details of the boxes, or holders, with their springs, etc., the specification concludes:

"In order to reduce the resistance of the carbon brush to the minimum, the boxes, CC', are brought down very close to the surface of the commutator; and, should the small resistance then remaining be a disadvantage, the brushes themselves can be plated with a good conductor, and all objection thus removed. I do not limit myself to the use of carbon alone, as any non homogeneous or porous hard conducting substance will answer the purpose and come within the scope of my invention."

The first claim, alleged to be infringed, is:

"(1) The combination, with a commutator cylinder formed of separated insulated segments, of commutator brushes bearing upon the surface thereof, and formed of carbon or other similar unyielding material, and of a width greater than the distances between the commutator segments, substantially as described."

Four other claims, not alleged to be infringed, deal with details of holders, springs, etc. The only one in controversy here is the first or broad claim for the use of "carbon" as a commutator brush. In view of the conclusion which has been reached, it will be necessary merely to allude briefly to some of the arguments which have been advanced on behalf of the defendant.

It is contended that the patent should be construed as calling for some peculiar kind of carbon, which will hold copper dust, as felt does rouge. This seems to be a very strained construction. Van Depoele, anxious to cover all possible equivalents, announced his invention as covering other similar unyielding material,—"any nonhomogeneous or porous hard conducting substance." But apparently he did not know of any other than carbon, nor so far as the record shows has any since been found. He found that the hard brittle

carbon of the art would in operation "form a smooth wearing face that is extremely durable." He had the idea that in some way or other this effect was obtained by copper dust worn off the commutator and taken up by the pores of the carbon. It makes no difference whether this idea of Van Depoele was correct or not. He has not made it a part of his invention. Carbon is a broad word. It may be used to include a diamond or soot; but according to all the canons of patent construction it must be here taken as meaning the carbon known at the time to electricians under that name,—the ordinary carbon of the art, such as was employed for the pencils of arc lamps, for battery plates, for rheostats or artificial resistances, and other similar electrical purposes. It was made up of some variety of coke, either from petroleum or bituminous coal, the structure of the material being agglomerate; that is, it is practically numerous particles cemented together, leaving pores between the particles, but not large openings. The improvement of the patent may be obtained by the use of just such carbon pencils or blocks; and, inasmuch as the inventor does not indicate that the functions discharged by the new brush are to be secured by the use of some peculiar variety of carbon not then used in the electrical art, there is no ground for thus confining his patent.

Leaving out of consideration for the moment a British patent (1,288 of 1885, to Forbes), the question of anticipation in the prior art as disclosed by patents may be briefly dismissed. No reference shows the combination of a commutator cylinder formed of separate insulated segments with commutator brushes of carbon wider than the distances between the segments. Separate insulated segments were old, solid brushes were old, wide brushes were old, radially applied brushes were old, and carbon applied to many uses was old; but the history of the difficulties attending the use of the earlier brushes, of the long period of discouragement during which persons skilled in the art and familiar with the many uses carbon subserves in that art, were striving ineffectually to overcome those difficulties, and of the prompt and almost universal acceptance of the solution offered by the carbon brush of the patent, shows clearly the existence of patentable invention sufficient to sustain the patent to the full breadth of the first claim.

Allusion has been made to British patent 1,288 of 1885 to Forbes. This antedates the patent in suit, for which application was filed February 8, 1887, renewed September 7, 1888, and patent issued October 9, 1888. A publication, "Thompson's Dynamo Electric Machinery of 1886," which referred to the device shown in the Forbes patent, was cited by the patent office against Van Depoele's application. Such a reference could, of course, be disposed of in one or other of two ways,—either by carrying back the date of invention for which patent was requested, or by satisfying the patent office authorities that the reference could be differentiated from the invention of the American applicant. Van Depoele's counsel chose the latter course, and succeeded in convincing the examiner that no part of the field covered by the first claim of the patent in suit was occupied by Forbes. Defendant contends that the patentee is now es-

topped from showing that he perfected his invention before the date of the Forbes patent. It is difficult to see why this should be, and in the absence of any authority to sustain such contention it cannot be accepted.

By stipulation of counsel the effective date of the Forbes British patent for anticipatory purposes is fixed as October 28, 1885. Aside from all other early uses by Van Depoele of his invention, the record shows a sale to the Rockford Air Brush Company of Rockford, Ill., of a small motor on which carbon commutator brushes were placed. Upon the oral testimony there is dispute as to whether this sale was in 1884, 1885, or 1886; but finally the shipping book was produced, showing shipment on September 21, 1885. The book was produced from the proper custody, was proved as a book of original entry, and a careful examination fails to disclose anything suspicious about it. The year is not entered on the page containing this entry, nor on some pages preceding and succeeding; but it is manifest that the entries at the tops of the pages were made continuously, and that this was in 1885. Lower down on the same page is an entry of 1887, but it is of a shipment to a new customer. Evidently the page was kept open for further shipments to the Rockford Company, until it became apparent that they were to buy no more. The evident intention was to give each customer a page, which accounts for dates in November and December appearing on an earlier page. Upon the proof there can be no doubt of this sale in September, 1885, nor that it was a reduction to practice such as would antedate Forbes; and this brings us to a branch of the case to which most of the proof has been directed.

Defendant's main defenses are an earlier use by Bottomley in Philadelphia, a similar one by Nolen in Toledo, and a public use by Van Depoele himself more than two years prior to the publication of the patent by filing application, February 8, 1887. The adverse uses need not be discussed, since the conclusion arrived at upon consideration of the evidence as to the patentee's own acts disposes of the case. The concrete question presented is this: Did Van Depoele prior to February 8, 1885, make a public use of the invention of the patent,—a use in an open way, which use was not experimental? This involves two inquiries: First, as to what he did; second, as to when he did it.

The evidence—complainant's evidence—shows that Van Depoele conceived the invention at least as early as 1881, when in his factory he used an arc light plated carbon, from which he had filed some of the plating, as a brush, and the machine ran successfully for an hour and a half. Van Depoele was dead when the record was made in this cause, and quite naturally the evidence of his proceedings from that time is somewhat fragmentary. It may be noted preliminarily that what the patent describes (so far as the first claim is concerned) is simply the use of just such a carbon in just such a way, and that arc-light pencils, or cut-up battery plates of the carbon then known to the art, will act, and act efficiently, in combination with the segmental commutators of the art as it was in 1881. If the patent is to be construed as it is construed supra, there would not seem to be

much room for experimentation beyond the use of 1881. Of course, if the carbons of that period were unsatisfactory, and the inventor were struggling to find some modification of their constituents, surface, structure, or application which would make them more efficient, and, having found it, claimed it, his experiments·might have continued for years prior to such discovery. But when the invention claimed is the invention practiced experimentally in the patentee's own shop six years before, subsequent uses open to the public view will be most carefully scrutinized. Testimony of various persons who worked with him shows various uses of carbon brushes subsequent to 1881, which need not be discussed, and also two uses in 1885. As the complainant's brief expresses it (and the proof warrants the statement):

"In July, 1885, he made a successful practical public use of the invention in connection with a public lighting plant at Cheltenham Beach, near Chicago, and in September, 1885, in the ordinary course of business, sold a motor equipped with carbon brushes."

There was nothing peculiar about the carbons in these machines. In the Cheltenham Beach case the "carbon brush was sawed out of a battery carbon that was half an inch thick." In the Rockford case "the carbon brushes were made of a strip of spring copper, and on the end was a piece of round plated carbon from an arc lamp and soldered to the end of the strip." The evidence does not show a use at Cheltenham for more than a week. Still during that time the combination of commutator and carbon brush, which the claim covers, was in practical, substantial public use. There is no evidence of any use of the Rockford machine; but, as there was no complaint made about it, we may infer it worked so far as the patented combination is concerned. These two uses are within the two-year limit. They antedate Forbes, but do not work an abandonment under the statute.

Still another use by Van Depoele is proved. The complainant first introduced it in evidence, contending that it occurred in the summer of 1885. It is known as the "Telpher Use." Van Depoele conceived the idea that it would be a good thing to convey ore from one mountain top to another by means of a car slung on a cable, operated by electricity, and arranged so as to reverse automatically. Adjoining his factory at the corner of Franklin and Van Buren streets, Chicago, was a vacant lot extending to Market street, a distance something less than 400 feet. In order to experiment with this new system of transportation, he had cables erected across this empty lot some 15 to 20 feet above the ground. On one of them there was a car suspended, in which was a motor, started by a generator in the factory. There was on the car an automatic reverser, which struck against a projection at either end of the line, reversing the brushes, and causing the car to start back. All the witnesses concur in the statement that this apparatus remained there for many months. Sometimes the car would be covered up, perhaps for weeks at a time. Then Van Depoele would run it up and down for half an hour or an hour. Whenever there were visitors around, he would show it to them. The man who helped to put it up, a witness called by complainant, testified: Originally there were copper brushes on

the motor. When it was put up, he got in the car, and started from the Franklin street side. When he got to the other end, the car stopped, and upon investigation he found that reversal had bent over the end of the brushes, which were thus out of contact with the commutator. The next day Van Depoele gave him two small copper brush holders, in which were ordinary electric light carbons. These he substituted for the copper brushes, and thereafter sat in the car, and ran it about four or five weeks, whenever there were visitors to the works. There was no further trouble. He ran it ten or fifteen minutes at a time. It always worked well, and equally well in both directions. One day, however, the wheels jumped off the cable, an accident in no way connected with brush or commutator, after which witness declined to ride in it. There is no dispute on the proof as to what this use was. As to a system for overhead electrical transportation it was experimental, but as a use of carbon brushes in combination with a segmental commutator on an electric motor it was a substantial public use. Speaking of this very use, at a time when the evidence seemed to indicate that, while antedating Forbes, it yet fell within the two years, complainant's expert says:

"It was a practical use of the invention, since the motor was used occasionally to propel the car in connection with the experiments on the cable system, which the apparatus was intended to embody."

This statement is entirely accurate. What, then, is the date of the beginning of the "telpher use"? for the evidence of the first operator shows clearly a successful use of carbon brushes within the first four weeks of the cable experiments. Crot, this first operator, gave the date as the summer of 1885, adding he began work at the factory in the fall of 1884. Subsequently he corrected the date of his arrival at the factory to March, 1884. Verstraete, one of complainant's witnesses, thinks it was 1883; says the cable system was a long time in the empty lot; may have been there up till 1884. McLaughlin, another of complainant's witnesses, says it was operating in 1884; that it was up there a long time; he thinks until 1885. Elsewhere he says he had seen carbon brushes used from 1883 to 1886,—one on a four-light machine in the factory six to eight months before the Cheltenham plant was installed, which he thinks "would be the winter of 1884–1885." Evidently his recollection as to dates is good, for the books show the Cheltenham plant was installed in June, 1885.

This witness says he is not sure as to dates of the "telpher use," but is sure it "was one of the earlier experiments." This would seem to indicate it was earlier than Cheltenham. McGhie, another of complainant's witnesses, says the suspended cable system was taken down in July or August, 1886, and moved over to the new factory, but not put up again, and that it had remained up in the neighborhood of a year and a half, which would bring it to January, 1885. Birtman, another of complainant's witnesses, says it was standing when they moved, which he says was May or June, 1886, and that the car and cables remained suspended over the vacant lot "a year or a little over." McDougall, one of defendant's witnesses, says that the car and cables were in operation in the fall of 1884. McKenzie, another of defendant's witnesses, puts it in 1883 or 1884.

The strong preponderance of all this evidence is to the effect that the first three weeks' use of the motor in this car, which car was used in the telpher experiments, was prior to February 8, 1885, and thus beyond the two years. Like all such evidence, however, it is somewhat unsatisfactory, being individual recollections of long-past dates, unchecked by any record evidence. Another witness, however, Archer, called by defendant, kept a diary, in which he recorded such important matters as change of residence or employment, receipt or disbursement of money, etc. The diary is produced, and there is nothing suspicious about it. The witness was twice employed by the Van Depoele Company. The first time he was in their employ he remembers distinctly seeing the suspended cables and car. The second time it was no longer there. He is not familiar with the details of its construction, and does not know what brushes it used; but that is immaterial. Other witnesses—complainant's own witnesses—tell us that. It appears by Archer's diary that he first came into the employ of the Van Depoele Company at Chicago in January, 1884, and remained with it until March 25, 1884, when he left and went to Rockford, Ill., in the employ of another company. He did not return to the Van Depoele Company until 1886. It seems impossible to escape the conclusion that the open and public use of carbon brushes on the motor in the "telpher system," testified to by Crot, was prior to February 8, 1885; and since, for the reasons above stated, it cannot be held to be experimental only, such use more than two years before application will defeat the patent. The bill is dismissed, with costs.