**BAKER–CAMMACK HOSIERY MILLS,**
Inc., et. al. v. DAVIS CO.

No. 5995.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 10, 1950.

Decided April 11, 1950.

See also 4 Cir., 181 F.2d 573.

Henry N. Paul, Jr., Philadelphia, Pa., and James F. Byrnes, Washington, D. C. (Ernest F. Mechlin, Washington, D. C., L. P. McLendon and Thornton H. Brooks,

Greensboro, N. C., on the brief), for appellants.

James P. Burns, Washington, D. C., and Charles A. Noone, Chattanooga, Tenn. (Robert E. Burns, New York City, and Welch Jordan, Greensboro, N. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Six United States patents, relating to elastic top self-supporting hosiery and methods for producing it, constitute the subject matter of this appeal. The Davis Company, the plaintiff in the District Court, is a corporation which was formed in 1946 to hold the patents for the beneficial owners. They are Scott and Williams Company, the largest manufacturer of circular hosiery knitting machines in the United States, Interwoven Stocking Company, the largest manufacturer of men's socks in the world, and W. B. Davis & Son, Inc., which until recently owned and operated a large hosiery mill in Alabama. The nominal defendants in the District Court were Baker-Cammack Hosiery Mills, Inc. and Baker-Mebane Hosiery Mills, Inc., located at Burlington, North Carolina; but the defense has been conducted and financed by the Hosiery Investigating Committee, an organization composed of one hundred and seventy-two hosiery mills located in North Carolina and fourteen other states, which was formed to investigate the validity of the patents and to defend suits brought to enforce them. J. E. Baker, president of both defendant corporations, is president of the Investigating Committee. Each member of the Committee has contributed financially to the defense of the suit. It was stipulated that one hundred and eighty manufacturers are involved directly or indirectly in the matters in issue. In argument it was stated that there are over five hundred hosiery mills in the United States.

There are two suits, one charging that Baker-Cammack has infringed five of the patents, and one charging that Baker-Mebane has infringed all of the patents in suit. Both companies are under the same management and control. The suits were consolidated and disposed of in one trial in the District Court, and conclusions of law and an opinion applicable to both cases were filed by the District Judge. 86 F. Supp. 180, 181. The court held in separate decrees that the patents are valid and have been infringed as alleged. The court also decreed in each case that the present firms and corporations comprising the Investigating Committee should be bound by the decrees except that all of them other than the named defendants were not adjudged guilty of infringement and were not deprived of the separate defense of non-infringement. The named defendants were enjoined from further infringement and the cases were referred to a special master to ascertain the damages sustained by the plaintiff by reason of the infringement by the named defendants.

In addition to the defenses of invalidity and non-infringement, the defendants raised the defenses: (1) that the plaintiff holding company was estopped from suing for infringement of the patents by reason of conduct of its predecessors in title which amounted to laches and acquiescence in the use of the patents; (2) that the defendant, Baker-Cammack, had acquired an implied license to use certain machines and attachments in making stockings under five of the patents in suit by reason of the purchase of the equipment from Scott & Williams when Scott & Williams had a controlling interest in the patents; and, (3) that the actions of the owners of the patents in forming the Davis Company and seeking to impose upon the industry the provisions of proposed license agreements offered in evidence constituted such a violation of the federal anti-trust laws and such an abuse of the patent monopoly as to disentitle the Davis Company to the enforcement of its rights under the patents. The District Judge rejected all of these defenses; but he stated in his opinion that it might be necessary in assessing damages to reexamine the evidence in order to ascertain whether Scott & Williams had furnished the defendants machinery and equipment for the manufacture of infringing

stockings as to confer upon the defendants an implied license to make infringing stockings on the equipment so furnished.

The great commercial importance of the products and processes described in the patents in suit is attested by the prominence of the beneficial owners of the patents in the industrial field and by the organization of a great part of the industry in a determined effort to destroy the patents and make use of the disclosures without compensation. It was found by the District Judge that the disclosures of one of the patents in suit, that is, the Davis Patent No. 2,306,246, granted to Robert E. Davis on December 22, 1942, on an application filed June 26, 1935, produced a great change in the manufacture of seamless hosiery. It had been customary for many years in knitting half hose to provide a top or calf portion of rib knitting in order to secure the desired elasticity, but to make the leg and foot of plain knit fabric in order to secure the desired fineness of texture. Hosiery fashioned in this way involved difficulties of manufacture which were avoided by Davis in a manner described in the following passage from the opinion of Judge Hayes in the District Court.

"This litigation concerns patents in the knitting of seamless hosiery which formerly involved three distinct and independent operations. The top of the hose was conventionally produced in the form of rib fabric on a separate machine for that purpose. The leg and foot of the stocking were produced of plain knit fabric formed on a so-called plain knitting machine having a single set of needles known as cylinder needles. The rib fabric tops produced on the rib machine were transferred by hand to the plain knitting machine. This required the use of a so-called transfer ring on which each succeeding rib top is placed by hand, loop by loop on the pointed quills of the transfer ring. The ring carrying the rib top is then placed on the plain knitting machine with each quill point in the ring fitted over a cylinder needle and the rib top is then moved down by hand from the ring on to the needles so that they will knit the plain knit leg and foot on to the rib top. This was the conventional method at the time of the inventions involved in this suit and the cost per dozen pairs of hose produced by this cumbersome method was 20¢ per dozen pairs more than the cost embodying the inventions of the patents in suit.

"Various attempts were made to improve this method of production as well as to devise some ways or means by which hosiery could be produced that would have the appearance of true one by one rib top and be self-supporting and with an anti-ravel edge or selvage. Attempts were made to produce a single machine capable of performing the rib top affecting its automatic transfer and continuing the knitting of the plain knit leg and foot, but this turned out to be very expensive and commercially unsuccessful. Attempts were made to produce a complete stocking on the somewhat simple plain knitting machine having a single set of cylinder needles but none of them were successful or solved the problem until Davis through his invention embodied in patent No. 2,306,246 discovered a commercially successful automatic top stocking possessing self-supporting characteristics that has not only made it competitive with the transferred rib top stocking but which has caused the automatic self-supporting top stocking to substantially displace the transferred rib top stocking in the commercial field. Davis achieved this result through a successful incorporation of an elastic strand into a plain fabric forming the top of the stocking in such manner as to draw in the plain fabric so as to have the normal width of true rib fabric and expansibility equal to or greater than that of true rib fabric and a self-supporting characteristic far beyond that possessed by true rib fabric. To the automatic top stocking of the Davis patent 2,306,246 Getaz invented the anti-ravel, a remarkably successful anti-ravel selvage for the stocking top which obviated the necessity for a separate hemming operation as disclosed in his patent 2,344,350. One method of forming the selvage edge is the subject matter of Getaz patent 2,054,217. Since the public demand required a stocking having the true one-

by-one rib appearance Getaz produced an automatic elastic top stocking which was indistinguishable from a true one-by-one rib fabric and is embodied in his patent 2,230,-402 and the corresponding method patent 2,230,403.

"Full fashioned hosiery is produced on flat bed knitting machines as distinguished from circular knitting machines and it was with the full fashioned hosiery that Gastrich was primarily concerned. He was endeavoring to avoid contraction rather than induce it and in Claims 1 and 4 of his patent No. 2,067,486 he discloses one form of elastic carrying selvage edge but quite different from that contributed by Getaz."

The problem which confronted the industry was to find a fabric which could be knitted automatically without transfer on a single machine and which would retain the desirable qualities of the conventional rib top that was uniformly used on men's and children's stockings. The advantages of the rib top were that it had a pleasant appearance, possessed considerable expansibility, would not curl at the edge and would not run from the top of the piece. The attempts to find the solution which preceded the inventions of Davis and Getaz included the manufacture of the whole stockings on a plain knitting machine, turning in the top and sewing it down to form a welt or turning in the top by machine, making an imitation rib top and turning it down to form a welt, making a separate rib top and sewing it to the stocking, and manufacturing the whole stocking on a machine which started on two sets of needles as a rib top and was then transferred automatically for the completion of the stocking on a single set of needles. The last described method produced a true one-and-one rib top and a plain knit leg but the machine was too difficult and expensive to operate. The other attempts also failed because the fabric produced was lacking looks, in expansibility and in wearing qualities, and the stocking was not as good as that made on two machines with the hand transfer. The difficulties were overcome by Davis and Getaz.

The six patents in suit, and nine others which are not here involved, were assigned by the owners to the Davis Company, the plaintiff herein, in the year 1946; and the Davis Company holds them under agreements which provide that all royalties from licenses and recoveries for infringement shall be distributed in specified proportions to Scott & Williams, Interwoven and Davis & Sons, who had acquired all the property rights in the inventions. Licenses to use the patents have been offered by the Davis Company to the industry generally in communications which stated that the inventions constitute a complete series of patents covering a plain knit elastic top hosiery. The discussion of the questions of validity and infringement of the patents in suit which follows demonstrates the close relationship between the patents and the extent to which they are adapted for use in combination in the manufacture of hosiery.

### Validity of Davis Patent '246.

Claim 14, the only claim of the Davis patent in issue, is as follows: "14. In an article of hosiery, a leg portion comprising a body having a top, said top being plain knit of inelastic fabric and having an elastic thread locked to spaced wales in each of a plurality of spaced courses, the normal length of elastic thread floated between said spaced wales being less than the normal length of the corresponding portion of the fabric to draw in the inelastic fabric both at and between elastic carrying courses."

The defendants contend that patent No. 1,843,086 issued to Robert H. Lawson on January 26, 1932, includes every element of claim 14 of the Davis patent and therefore anticipates it. The Lawson patent shows a stocking in which an elastic thread is knitted with inelastic thread in the leg portion but he does not teach the use of "an elastic thread locked to spaced wales in each of a plurality of spaced courses". Lawson himself testified in the District Court that this feature was the key to the great practical success of the Davis fabric which the Lawson patent failed to achieve. Lawson was an active party with others to an interference proceeding in the Patent Office between the application of Davis, which resulted in his patent '246, and an

application by Lawson. After passing through the tribunals of the Patent Office the interference was finally decided in Davis' favor by the Court of Customs and Patent Appeals in Lawson v. Davis, 129 F.2d 873, 29 C.C.P.A., Patents, 1217. The interference was closely contested throughout by persons experienced in the knitting art and in Patent Office technique on both sides, and it was tried on the assumption that the competing applications involved a feature not covered by the Lawson patent No. 1,843,086 which was an exhibit in the case. Indeed this Lawson patent was before the Patent Office as part of the prior art when the patentability (as distinguished from the priority) of the Davis invention was considered; and it is significant that although the defendants pleaded many prior patents against Davis, they did not include the above mentioned Lawson patent in the list.

Lawson was also a party at or about the same time to interferences involving other patents in suit. He testified as a witness for the plaintiff in the pending case that the stocking described by him in his patent No. 1,843,086 was made on a single machine in one automatic operation; that the Hemphill Company, a manufacturer of hosiery machinery, to which he had assigned the patent, had granted a license to the Interwoven Company. He added, however, that the fabric manufactured under the teaching of his patent was unsuccessful because the rubber was knitted into alternate needles in every course and because the available elastic was short stretch; but he also said that even today with improved elastic the fabric of his patent is not successful and has never been used. As he himself expressed it, he almost had the solution but missed it and the things he missed made the difference between a highly desirable article and one that was more or less experimental. The situation is strikingly similar in Eibel Process Co. v. Minnesota etc. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523, wherein a simple solution of a problem which had

long harrassed an industry was deemed to be worthy of a patent. That Davis and Getaz succeeded where others failed is demonstrated by the universal desire to use their fabric, rather than to follow the teachings of Lawson and the others whose patents had expired.

In deciding questions of this kind the court must of necessity consider the testimony of expert persons skilled in the relevant art. The District Judge was greatly impressed by the testimony of Lawson on behalf of the plaintiff. He had graduated from the Massachusetts Institute of Technology, had more than twenty-five years' practical experience in manufacturing hosiery machinery and fabrics, and had been granted many patents in this field. He had been connected with the Hemphill Company which manufactured hosiery machines and which had been organized by his father and grandfather.[1] He was in charge of its research department for a time and was president from 1933 to 1937. In 1937 he left the company because of a disagreement as to business policies, but remained on friendly terms with the corporation and testified voluntarily in its behalf in the interference proceeding above mentioned. In 1937 he joined the Lawson Company to help perfect a fabric invented by his father who was the company's president. He became president himself in 1940 upon his father's death. The company is a small one and he has acted as consultant for other corporations and since 1940 that part of his activities has been used by Scott & Williams, one of the beneficial owners of the patent in suit. Our opinion of the value of the Lawson testimony in the pending case, after careful examination, accords with that of the District Judge.

The defendants make the additional contention that the peculiar feature of the Davis patent, that is, the presence of elastic in spaced courses was not new with him but was known as early as 1886 in the Sturgess British Patent No. 4418. In Sturgess, as in the Lawson patent, which we have just discussed, there was shown the

1. The Hemphill Company is defendant in the companion suit, No. 5994, where it is charged with the infringement of a Davis machine patent.

incorporation of rubber in the top of a stocking made in a continuous operation on a circular knitting machine. Sturgess also showed that the elastic thread might be inserted with any number of feeders for producing the plain fabric on one set of needles; and it is contended that thereby the knitting of rubber in spaced courses was indicated since the number of feeders of inelastic yarn determines the spacing of the elastic yarn.

Defendants also point out that when Adamson introduced his elastic "Lastex" yarn he stated in his French patent No. 721,840 of 1931 that if it is desired to produce stockings to be worn without garters, it is preferable to knit several spaced bands of elastic thread in the upper part of the article. There was no mention of this feature in the contemporaneous Adamson United States patent No. 1,822,847.

Defendants also contend that the same thing was disclosed in the Grasham patent No. 1,829,086 of 1931 in the description of a stocking with several rows of elastic cords spaced apart.

The argument against the validity of the Davis patent prevailed in 1944 in the case of W. B. Davis & Son, Inc. v. Woolworth, Ltd., in the High Court of Australia where the corresponding Australian patent to Davis was stricken down for want of invention. The court held that there was no invention in taking an elastic thread (lastex) that was on the market and using it for the purpose for which it was manufactured in the manner suggested by the maker.

On the surface, these considerations seem persuasive but they do not bear close scrutiny. Sturgess made no claim in his patent to the introduction of rubber in spaced courses in the stocking top. His specifications were indefinite and as the Board of Appeals in the Patent Office pointed out in considering his patent when the Davis application was before it, Sturgess did not clearly disclose the idea of spacing the elastic to get a good gripping effect. He merely claimed the method of putting the elastic into the back of the fabric in order to retain the article in place. He was not dealing with the same problem as Davis;

and it is significant that although his patent had been on the books for fifty years when Davis filed his application, no one had learned from it how to solve the difficulty. The Grasham patent in its specifications speaks of incorporating elastic yarn in some way not clearly explained with the threads "forming the ribs of the fabric" and the claims call for a combination "with a stocking having a ribbed upper portion," of supporting means comprising strands of elastic in the upper end of the ribbed portion and knitted with the yarn of the fabric. Grasham did not describe the elimination of the rib top and the substitution of the plain knit top. He only tried to make the rib top self-supporting. Grasham is an employee of the defendant Baker-Mebane, but it does not make his stocking.

The Adamson French patent is based on a form of covered rubber thread as it existed in 1931. The patent had no relation to the manufacture of a stocking top or the formation of a selvage edge. The elastic thread which it described was not suitable for the manufacture of the elastic plain knit stocking top of the patents in suit; and the evidence shows that Davis and Getaz used uncovered cut rubber thread in making their inventions; and that it was not until afterwards that lastex suitable for their purposes was produced. The record before us does not permit the findings of fact upon which the Australian court based its decision.

The Davis application was before the Patent Office for more than seven years; and the finding of invention was made after extended consideration in which prior patents were cited, including the Lawson patents Nos. 1,843,086 and 1,996,648, and the Adamson patent No. 2,103,133, and after an interference in which claims to priority were pressed by able and experienced contestants. The presumption of patentability springing from the issuance of the patent is therefore entitled to full weight; Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, 83; and in this case it is supported by the evidence that the industry had long been in search of a solution of the problem and that when it was found by Davis its merit was im-

mediately recognized. Interwoven took steps in January, 1935, to obtain an exclusive license for men's half hose alone and paid a royalty of 4¢ per dozen pairs, which amounted in the aggregate to more than $200,000 by December 1, 1948 in spite of the fact that the use of rubber in the hosiery industry was forbidden on account of the war during the critical period between the spring of 1942 and some time in 1945.

### Infringement of the Davis Patent '246.

Defendants contend that they do not infringe claim 14 of the Davis patent. It describes an article of hosiery to which the leg portion has a top which is plain knit of inelastic fabric and has "an elastic thread locked to spaced wales in each of a plurality of spaced courses." Defendants say that in their stockings the elastic yarn is not locked but is "interlaced or laid in in the fabric."

In the technical language of the art a distinction is made between knitting a thread into a stitch and interlacing it. In the first operation the loops of one thread encircle the loops of the other, while in the second operation one thread is merely laid in or run through the loops of the other but does not form loops itself. The defendants contend that the language of claim 14 shows that the thread is knitted in and not laid in and they point to numerous statements in the specifications and other statements in the proceedings in the Patent Office which indicate that the patentee intended that the elastic should be knitted into the fabric in the narrow sense of the term.

Nevertheless it appears in the specifications that the elastic is knitted into the fabric in such fashion that when the fabric is formed the elastic straightens out and passes through the loops of inelastic thread without enclosing them; and it is of course true, that even when the elastic is "interlaced or laid in", it is embodied in the stocking in the course of a knitting operation on a knitting machine and becomes part of a knitted fabric. Moreover, the patentee in claim 14 described the elastic thread as "locked" in whereas in other

claims he speaks of it as knitted into the fabric; and consequently he is entitled to a distinction between the claims, if the patent may be so interpreted as to support it, because it is the settled rule that a limitation in claims not in issue may not be used to restrict claims in suit. Skelton v. Baldwin Tool Works, 4 Cir., 58 F.2d 221, 227. We note in this connection that the term "lock" as used in the knitting art, was interpreted in the interference proceeding, Lawson v. Davis, 129 F.2d 873, 29 C.C.P.A., Patents, 1217, where the court, quoting the examiner of interferences said that it appeared that the term "lock" is generic to both "knit in" and "laid in." For our present purposes the important consideration is that the defendants offer only a bare distinction between technical terms to avoid infringement of a meritorious patent and such a defense should not find favor with the court. It is plain that the defendants are using the essence of the patent in incorporating an elastic thread in spaced wales in a plurality of spaced courses of the fabric; and it is equally clear that in their manufactured article the elastic thread has become part of a knitted fabric. Thereby they secure a structure which is substantially equivalent to the structure of the patent and it would be unreasonable to declare them free of infringement of a product patent merely because they accomplish their purpose by a slightly different method. Samuel M. Langston Co. v. F. X. Hooper Co., D.C.Md., 8 F.Supp. 613, affirmed 4 Cir., 79 F.2d 992; Oates v. Camp, 4 Cir., 83 F.2d 111, 115.

### The Getaz Patents.

The four Getaz patents introduced substantial improvements in the manufacture of plain knit elastic top self-supporting hosiery suitable for use in connection with the fabric disclosed by the Davis patent. They consist of an anti-ravel selvage for the top of the stocking and a top of plain fabric indistinguishable in appearance from the popular one-and-one rib fabric, and methods for making the same.

### Validity of Getaz Patent '350.

This patent relates to an anti-ravel selvage which the Davis patent does not dis-

close. The edge corresponds to the rest of the top and is made in the same operation. In the Davis stocking the top is turned down and sewn on a sewing machine to form a welt in a separate operation after the stocking is knit and it does not present as neat an appearance as the Getaz fabric. The Getaz selvage locks the stitches of the plain fabric to prevent their running and at the same time reduces the diameter of the stocking top so that the stocking becomes self-supporting.

The claims in issue are claims 1 to 7. Claim 1 is as follows: "A selvage or anti-ravel edge for the top of a seamless circular plain knit article of hosiery which consists of a seamless circular knit body yarn course and an elastic yarn extending through all of the loops of said body yarn course, and being under sufficient tension to draw the said loops into close relation with each other around said elastic yarn, and materially reduce the diameter of the edge in the undistended condition, the frictional engagement of said closely associated loops with said elastic thread holding the latter against loss of tension when the edge is distended, said elastic thread under tension extending through subsequent courses of the fabric and being united to the fabric at spaced points in said courses and floated between said points on the inner face of the fabric."

Defendants contend that the patent is invalid under the statute, 35 U.S.C.A. § 69 by reason of a sale of stockings involving the invention alleged to have been made more than two years [2] before April 14, 1938, the filing date of the patent. A commercial sample consisting of seven pairs of stockings embodying the invention was sent on or about November 6, 1935 by the Ideal Hosiery Mills of which Getaz was president to Iselin-Jefferson Company, its sales broker in New York which sold the output of the mill. The shipment was covered by an invoice indicating that the samples were sold to the broker. Correspondence between the mill and the broker shortly before this date shows that various samples were sent with instructions to sell goods like the sample for the account of the mill.

It does not appear, however, that any sales of the new stocking were made to the trade. Indeed the mill was closed and the business liquidated in January, 1936 by reason of financial difficulties. Upon this evidence the District Judge held that there was no sale or offer of sale to the public or to any one except the broker, and that the transaction with the broker did not invalidate the patent. We agree with this holding for it is obvious that there was no sale within the terms of the statute, but only certain preliminary steps looking toward sales of the article which in fact never occurred. The situation may be contrasted with that discussed in the opinion of this court in Jordan v. Hemphill Company, 4 Cir., 1950, 180 F.2d 457, wherein a prior sale was held to invalidate a patent.

The point is of no practical importance in this case because as the District Judge also held, even if the shipment of the samples to the broker constituted a sale, the patent would not have been lost since Getaz was entitled to the filing date of December 10, 1935 for his patent. The patent '350 was involved in two interferences with the Hemphill Company and was awarded priority as to claims 1 and 3 during the interference, as has hereinbefore been shown. The examiner of interferences pointed out that although Getaz did not file his application until April 14, 1938, he had disclosed his invention in the original application for patent '402 on December 10, 1935, and was therefore entitled to that as the effective filing date of patent '350.[3]

2. The amendment of this section by the Act of August 5, 1939, does not apply to this case.

3. All four Getaz patents were based upon an application Serial No. 53,924 which was filed in the Patent Office on December 10, 1935. Patent '402 for the fabric with the one-and-one rib appearance was issued February 4, 1941. Prior thereto the application was divided and an application for patent '217 covering a method for making the anti ravel selvage was filed January 14, 1936, and granted September 15, 1936. The application was again divided and an application covering a method of making the simulated rib fabrics was filed July 13, 1937 and granted as patent '403 February 4, 1941.

■ Another defense set up against patent '350 is that it was anticipated by the fabric of the Horn Surgical Company which was a rib knit article of hosiery knit on a circular machine and comprising a body yarn course with elastic yarn extending through all the loops thereof. The evidence indicates that the Horn fabric came off the machine with a smaller diameter than that of the needle cylinder, and it is therefore contended that the fabric had sufficient tension to draw the loops together and reduce the diameter of the edge. However, it is admitted that the Horn stocking consisted of rib and not plain fabric and therefore did not contain the important feature of patent '350 which is described in claim 1 as "said elastic thread under tension extending through subsequent courses of the fabric and being united to the fabric at spaced points in said courses and floated between said points on the inner face of the fabric." All the claims of patent '350 call for plain and not for rib fabric. With respect to the Horn disclosure, we are in accord with the following finding set out in the opinion of the District Judge: "Horn surgical stocking is a one by one true rib fabric formed on a knitting machine having both dial and cylinder needles. In rib fabric there is no need for an anti-ravel selvage edge. A rib knitting machine can not be started up on bare needles. Horn was not faced with a problem of forming an anti-ravel selvage edge in plain knit fabric. His work was in a different field which did not teach a solution of the problems solved by the inventions of the patent in suit." [86 F.Supp. 186]

## Infringement of Patent '350.

■ The defense of non-infringement as to this patent is directed to a single element that appears in all the claims, namely, the statement that the frictional engagement of the closely associated loops of the inelastic yarn with the elastic thread which extends through the loops holds the elastic thread against loss of tension when the selvage is distended. In the manufacture of the goods the free end of the elastic thread is cut off close to the point where it projects from the selvage, but it is held within the encircling loops without slippage by frictional engagement with them. Defendants say that this frictional engagement does not occur in their stocking and that they avoid the problem of slippage by leaving a longer piece of the elastic thread projecting from the top of the stocking as it comes off of the machine, and that during the finishing operation in which the stocking is stretched from time to time, there is some slippage, and finally the end of the elastic is clipped off. It is however clear, as found by the District Judge, that in the defendants' article there is frictional engagement which serves to return the stocking top after distension to its normal width. This is an essential feature of the self-supporting stocking; and defendants do not avoid infringement by showing that in producing their goods there is more slippage of the thread than is indicated in the specifications of the patent.

## Validity of Getaz Patent '217.

■ This patent covers one method of forming the anti-ravel selvage of the stock-

Finally an application in the nature of a division or continuation of the original application, covering the anti ravel selvage itself was filed April 14, 1938 and granted March 14, 1944 as patent '350. While the application for the last mentioned patent does not expressly state that it is a division of the original application, the parties to the pending case originally stipulated that the application was such a division. During the trial of the case defendants' attorney expressed some doubt on the point and asked that the stipulation be amended. There is, however, no room for doubt as to the actual situation. When the application for patent '350 was considered in interference proceedings in the Patent Office, it was treated as based on the original application of December 10, 1935, and held entitled to that date. The District Judge reached the same conclusion and it is obviously correct because a comparison of the contents of the original application with the specifications and claims of patent '350 shows that the latter was drawn from and based upon the former. It thus appears that the application for patent '350 was pending in the Patent Office before patents '402 and '403 were granted.

ing top which as a product is covered by Getaz patent '350. Claims 10, 12 and 14 are in suit. Claims 10 and 14 are as follows:

"10. In a method of knitting a seamless plain knit stocking, the steps of feeding an elastic anti-ravel yarn in advance of the normal feeding point, interlacing said yarn alternately in front of and behind the needles, feeding a second yarn to all the needles at the normal feeding point, and drawing loops of the second yarn and throwing the elastic yarn clear of the needles so as to make an anti-ravel selvage at the end of the first passage of the needles through the knitting wave."

"14. In a method of knitting a seamless plain knit stocking, the steps of starting up on the bare needles by moving alternate needles from a common position and feeding an elastic anti-ravel yarn from a point in advance of the normal feeding point so as to interlace the yarn in front and in back of alternate needles, subsequently destroying the needle alteration, then feeding a second yarn from the normal feeding point and drawing loops of the second yarn and throwing the elastic yarn clear of the needles to make the selvage."

Defendants contend that the patent is invalid because it is anticipated by the Scott patent No. 1,148,056 of 1915 which pertains to a method of making selvaged knit fabric. Getaz refers to the Scott patent in his specification where he says that the actual interlooping of the yarns in his invention is somewhat similar to Scott's, but that his method of manufacture is much simpler and more satisfactory than Scott's, as far as concerns the tension of the yarns. The Scott patent was continuously before the Patent Office when patent '217 was considered and granted.

Scott made no mention of elastic thread. He was concerned with making a loose inelastic selvage and employed two yarns for this purpose. He first made an initial course of one yarn in the hooks of all the needles, then cast off the loops at recurrent needles, and then enveloped the initial yarn by a second yarn in subsequent courses so that it might "serve to lock against ravelling the following web." The initial yarn was thereby interlaced so that it was in a position in front of one needle and behind the next. He did not feed his initial yarn in advance of the normal feeding point and then feed the second yarn at that point and form the selvage at the end of the first passage of the needles through the knitting wave.

Getaz teaches that in order to form an anti-ravel selvage, an elastic yarn should be threaded through all the loops of the first row of the finished fabric. The elastic is fed into the knitting machine at a point in advance of the normal feeding point in such a manner that as the needles come to this point the elastic is in front and in back of alternate needles. The inelastic body yarn which is to form the first row of loops is then introduced and the knitting wave begins. When the machine has made one revolution from this point and the first course is finished, the loops of body yarn are drawn on opposite sides of the rubber and the selvage is formed. The evidence stresses the importance of introducing the elastic in advance of the feeding point with the result that the selvage is complete in one course of feeding from the time that the inelastic yarn is taken by all of the needles.

The Getaz specification also states that in his invention either or both of the yarns may be elastic but all of the claims are restricted to the use of an elastic yarn in connection with a second yarn.

The distinctions between Getaz and Scott justified the conclusion of the Patent Office and of the District Judge that the defense of anticipation is not made out.

### Infringement of Getaz Patent '217.

The defendants contend that they do not infringe because in their machine it requires more than one complete revolution of the needles measured from the point where the elastic is introduced to complete the selvage; and hence they say that their method is indistinguishable from that of the Scott patent. This contention, however, is not tenable because it proceeds from the mistaken notion that the Getaz patent contemplates that the selvage will

be formed in one revolution of the needle cylinder after the elastic is introduced, whereas the patent shows that the selvage is made upon the completion of the knitting wave which does not begin until the inelastic yarn is fed to the needles.

As to claim 14 defendants make the additional argument that they do not follow the sequence of steps therein described. The claim speaks of moving alternate needles from a common position or level and feeding the elastic yarn so as to interlace it in front and in back of alternate needles and then destroying the needle alternation by bringing the needles to a common level and then feeding the second yarn from the normal feeding point. In the defendants' method the elastic is fed to the hooks of every alternate needle and then the needles go down to a common position whereupon the elastic yarn is pushed in back of every alternate needle, so that when the knitting point is reached the yarn is in front and not back of the alternate needles. The similarity of the methods is obvious and the difference between them is of such trivial importance that infringement of the claim is not avoided.

### Validity of Getaz Patent '402.

■ In the production of the self-supported stocking of plain knit fabric containing elastic thread, it is desirable that the stocking top conform to the appearance, to which the public is accustomed, of the true one-and-one rib top stocking. Getaz patent '402, accomplishes this purpose. It discloses a stocking top that is contracted by the elastic so that the wales are drawn together alternately on the back and front of the fabric and the fabric is given a flat surface so similar to the one and one rib fabric that even experts are frequently unable to detect the difference. The elastic is interlaced and lies in the loops of the first course of inelastic yarn and thereafter is repeated at intervals in the stocking top.

Defendants attack the validity of the patent on the ground that the degree of tension to which the elastic yarn must be subjected in order to give the stocking the desired appearance is not shown with sufficient definiteness in the patent; and that if the degree of tension is disregarded the fabric of the patent is indistinguishable from that shown in the German patent to Teufel of 1902 and that shown in the British patent to Sturgess of 1886. The Sturgess patent has been hereinbefore discussed in connection with the validity of the Davis patent '246. It showed the interlacing of elastic thread for retaining the stocking in position but it did not show the incorporation of the elastic in such a manner as to draw the material together under tension so as to produce a fabric similar to a one and one true rib fabric. Teufel has even less bearing on the patent in suit; and it is significant that neither of these patents which have been public property for many years taught the industry how to produce the Davis or Getaz stocking. Both patents were considered by the Patent Office in connection with Getaz patent '402. There is no substance to the contention that the degree of tension is not stated with sufficient definiteness in the patent. The evidence clearly shows and there is no contradiction that more specific instructions were not needed since a good knitter with the patent before him could easily produce the desired effect.

The defendants themselves experienced no difficulty in this respect when once they were acquainted with the disclosure of the patent. They fed the elastic to the machine stretched to its full capacity. The result was that the top of the stocking was confined to a much smaller width than the fabric, if unrestricted, would have assumed. In that condition the submerged wales of the top of the stocking are invisible like the rib wales in the one-and-one rib top, but when the top is stretched, the submerged wales come out and are visible. In other words, the one-and-one rib effect is obtained.

An article by William H. Horn published in the Surgical Appliance and Instrument Review of May, 1924, hereinbefore referred to in connection with the validity of patent '350, is also cited by the defendants in this connection. It referred to seamless elastic hosiery in which varying lengths of stretched rubber were used to make the desired unstretched length of the particular

course. The article consisted of rib knit fabric manufactured on two sets of needles in the cylinder and dial. Each revolution produced a course of rubber which was knitted to the preceding course. The article related to the production of surgical rib-knit stockings and the idea of simulating rib fabric was not suggested. A separate finishing operation to form a selvage was required. The article did not teach the procedure which the industry now practices in conformity with the inventions in suit.

Again it is said that all that Getaz did was anticipated by a model K Scott & Williams machine which Getaz saw at an exhibition in Philadelphia in April, 1935. The machine was designed to make ladies' stockings with elastic interlaced under special attention to form a garter. Getaz's work predated this show and Scott & Williams took an option on the Getaz patent '402 in 1937.

### Infringement of Getaz Patent '402.

■ Lack of infringement is claimed on the ground that the claims of the patent call for the use of elastic under heavy tension to produce the rib effect whereas in the manufacture of the defendant's stocking, the rubber is not fed under heavy tension and is not under heavy tension in the defendants' stocking in its contracted condition. The District Judge, however, found that claims 2 and 4 of the patent were infringed and the weight of the evidence shows that the rubber was fed to the defendants' machines under heavy tension sufficient to accomplish the desired effect. The result was that in the finished stocking the rubber contracted the top to a narrow width so that the material was under tension with little stretch in the elastic. When the top is distended, as when it is put on, the tension is increased. This of course is the normal action of the patented article.

### Validity and Infringement
### of Getaz Patent '403.

■ This patent discloses the method for constructing the fabric covered by Getaz's patent '402. Claims 1 to 7 in suit are expressed in terms of method rather than fabric. Claims 1 and 7 are as follows:

"1. In a process of making a plain knit seamless stocking, the steps of starting up on the bare needles of a circular knitting machine by successively feeding an elastic yarn in front of and in rear of successive needles so that it will be placed below the latches, then feeding an inelastic yarn into the hooks of all the needles in the same course and knitting off both yarns simultaneously and repeating these manipulations in some subsequent courses, the elastic yarn being always fed under abnormally heavy tension sufficient to contract the fabric to not more than two thirds its normal circumference and to draw alternate wales together to form the outer face of the fabric and to submerge the intervening outwardly facing wales in rear of said alternate wales."

"7. The process of forming a tubular seamless plain knit elastic fabric having the characteristics of a 1 x 1 rib fabric on a single series of needles, which comprises feeding to said needles both an inelastic and an elastic thread, and knitting a plurality of plain knit courses forming a plain knit fabric in which are incorporated said elastic and inelastic threads, said elastic thread being under the proper tension to materially reduce the width of said plain knit fabric, said elastic thread being incorporated in alternate wales and free of intervening wales of said plain knit fabric so as to bring intervening wales adjacent to each other to form the face of said plain knit fabric."

The same defenses of invalidity, indefiniteness and non-infringment are made against this patent as in the case of '402 and the same answers apply.

### Gastrich Patent No. 2,067,486.

This patent relates to full fashioned hosiery, that is, stockings produced on flat bed knitting machines as distinguished from the circular knitting machines used in the production of the fabric with which the other patents in suit are concerned. Full fashioned hosiery is usually seamed in the back. In this field Gastrich devised an elastic selvage primarily for women's plain knit stockings and one form of this selvage is applicable not only to full fashioned hosiery but also to seamless hosiery. Gas-

trich desired to avoid rather than induce the contraction of the stocking top and his selvage is quite different from that shown in the later patent to Getaz '305. It was before the Patent Office when the Getaz patent was allowed. It is, however, generic too and comprehensive of the selvage shown in the later patent.

It had been customary in the manufacture of full fashioned hosiery to provide a two ply or folded welt at the top of the stocking in order to provide a ravel proof selvage. Gastrich provided a single ply welt that would not only be ravel proof but would possess the proper degree of elasticity. For this purpose he used a marginal body yarn course at the top of the stocking and ran or interlaced a separate elastic yarn through all the loops of the course. Claims 1 and 4 are in suit. They are as follows:

"1. A stocking comprising a ravel-proof top edge consisting of a marginal body yarn course and an elastic yarn separate from the body yarn extending substantially parallel to said top edge through all of the loops of said course."

"4. A stocking having a single ply welt comprising a ravel proof top edge consisting of a marginal body yarn course and an elastic yarn separate from the body yarn of said welt and extending substantially parallel to said edge through all the loops of said course."

Defendants contend that this patent is invalid because it is anticipated by the Scott patent No. 1,148,056 when considered in connection with the Getaz patent '217, and is also anticipated by a stocking sold by the Horn Surgical Company since 1922. These contentions, however, may be passed over since we find no infringement of the patent by the defendant because the patent is limited to full fashioned hosiery. In the opening sentence of the specification it is stated that the invention relates to such hosiery; and when the application was pending in the Patent Office the inventor emphasized this fact and pointed out that the processes and machines in the full fashioned field are so different from those used in the circular knitting art as to leave no room for comparison. He referred to the above mentioned Scott patent, then nineteen years old, and strove to differentiate it on the ground that it pertained to circular knitting and hence did not apply to full fashioned hosiery. The patent was granted on January 12, 1937, and some months thereafter Gastrich filed an application for a reissue on the ground that the patent was partly inoperative in that the disclosures and claims had been inadvertently limited to full fashioned hosiery. The application was rejected by the examiner who was of the opinion that all of the claims of the patent, those limited to full fashioned hosiery as well as those without this limitation, should be rejected on the prior art including the patent to Scott and the British patent to Sturgess. Shortly thereafter Gastrich withdrew the application for reissue and filed a request for the return of the original patent which was granted.

We are of opinion that this course of action on Gastrich's part constituted a complete disclaimer that the invention applies to seamless hosiery. When claims are rejected and withdrawn while an invention is pending in the Patent Office the patentee is estopped to contend that the allowed claims should be given the same breadth and interpretation as the abandoned claims. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 218, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736. It is true that claims 1 and 4 of the original patent which was restored to the inventor are not restricted to full fashioned hosiery. They must, however, be construed in connection with the specification which relates expressly to hosiery of this sort; and any doubt as to whether this limitation should be read into the claims is removed by the assertions of the inventor in his application for reissue. We are of opinion that the defense of non-infringement is made out.

Confining ourselves on this branch of the discussion to the attack upon the validity of the patents and the defense of non-infringement, we are of opinion that except as to the Gastrich patent, the plaintiff has made out its case. It is supported not only

564

by the preponderance of proof in respect to the technical aspects of the knitting art and to quesions of patent law, but also by general considerations that may be taken into account when the validity of issued patents is attacked. The immediate recognition by leaders of the industry and their willingness to pay substantial royalties are enough in themselves to prove the practical value of the discoveries. Interwoven acquired an exclusive license to manufacture men's hosiery under the Davis patent on July 1, 1935, and has paid approximately $250,000 in royalties thereunder, first at the rate of 4¢ and later at the rate of 2¢ per dozen pairs. Interwoven also acquired an exclusive license to manufacture men's hose under the Getaz patents on April 29, 1936, and in consideration thereof, agreed to pay Getaz $6,000 on account, and to pay the expenses of prosecuting the application for the patents then pending, and to pay an additional sum of $6,500 when the patent was granted. Interwoven altered a thousand machines at a cost of $150,000, in order to equip them to produce the Davis-Getaz stocking. It has spent $650,000 in expenses and royalties in making the new tops. John Wyckoff Mettler, President of Interwoven, estimated that 50,000 machines in mills throughout the country were similarly made automatic when the inventions became known. He testified that the inventions contributed the most important improvements to the industry in forty-five years. On the 15th of September, 1937, Scott & Williams acquired an option under the Getaz patents, subject to the exclusive license of Interwoven for men's hose, and paid Getaz substantial sums for this privilege and for further services in making improvements for Scott & Williams in the textile field. Scott & Williams on July 29, 1938 also acquired an exclusive license to manufacture hosiery under the Gastrich patent by reason of an agreement with the Textile Machine Works, the owner thereof. In addition the whole industry has stirred to investigate the inventions and has found them to be so useful that they have manifested their intention to practice them by joining in the defense of the pending suit.

The practical commercial success of the inventions could not be more conclusively established; and the presumption of validity which attaches to the grant of the patents is strengthened by this fact, by the intense scrutiny to which the inventions were subjected during long drawn out interference proceedings in the Patent Office, and by the eagerness with which the industry has welcomed the economies which the patents have wrought. Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401, 404; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794, 801; Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, 83.

Laches, Acquiescence and Implied License.

Additional defenses now to be considered are based upon the broad ground that even if the patents are valid and have been infringed, the plaintiff has lost the right to enforce them. It is contended in the first place that in the period between 1935 and 1946, when the inventions were separately owned, the owners took no steps to notify the industry of their rights although they knew that many mills were knitting elastic stockings with lastex, and for this purpose were using various mechanical attachments with their knitting machines in violation of the patents. Indeed it is said that the industry was solicited and encouraged in this activity by the former owners, and as a result the defendant and other mills spent large sums in installing additional machinery, and thereby the plaintiff is estopped to prosecute the pending suit. The rule is invoked that a patentee may not prosecute one for patent infringement whom he has encouraged to use the patent and to spend large sums to equip himself for the purpose, and that in this respect the actions of the owners of a patent are imputed to his successors in title. Ford Motor Co. v. K. W. Ignition Co., 7 Cir., 278 F. 373; Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, Inc., 4 Cir., 165 F.2d 693, 695; Gillons v. Shell Co., 9 Cir., 86 F.2d 600.

Closely allied with this defense is the contention that the defendants acquired

an implied license to use the Gastrich and Getaz patents because they purchased knitting machine attachments for making elastic top hosiery from Scott & Williams at a time when Scott & Williams owned a controlling interest in the applications which resulted in these patents. The doctrine is invoked that one who sells a patented machine to another is estopped from prosecuting the vendee for infringement for its use because the sale confers an implied license. St. Joseph Iron Works v. Farmers Mfg. Co., 4 Cir., 106 F.2d 294. The rule applies even though the vendor does not acquire title to the patent until after the sale of the machine. Gottfried v. Miller, 104 U.S. 521, 529, 26 L.Ed. 851; United Printing Machinery Co. v. Cross Paper Feeder Co., D.C., Mass., 220 F. 322, 324. The right to use the patent in such a situation, however, is an incident of ownership of the particular machine and is confined thereto and does not constitute a general license to practice the invention. George Close Co. v. Ideal Wrapping Machine Co., 1 Cir., 29 F.2d 533; Miller Hatcheries, Inc. v. Buckeye Incubator Co., 8 Cir., 41 F.2d 619, 621; Hughes Tool Co. v. Owen, 5 Cir., 123 F.2d 950; Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 325, 336, 29 S.Ct. 503, 53 L.Ed. 816; Brown v. Puget Sound Reduction Co., C.C.Wash., 110 F. 383, 386.

The evidence on this phase of the case may be summarized as follows: The defendant Baker Companies have been accustomed in the past to rely on the advice of manufacturers of knitting machines, such as Scott & Williams, in solving their mechanical problems. Scott & Williams called their attention to elastic top hosiery in a letter of October 14, 1937 in which it said that it had devised a rubber laying in attachment for its Standard H machine and that a sample of the device had been left at the defendants' plant. At that time Scott & Williams had an exclusive license under the Gastrich patent and an option to purchase the four Getaz patents in suit. In the same letter, however, Scott & Williams warned Baker that applications for patents, covering both the machine and the fabric, were pending and that the situation

with respect to the patents was in the dark until the Patent Office took definite action.

The defendants, however, did not accept this offer for the reason, as the evidence shows quite clearly, that they were apprehensive with respect to the patent situation. In September, 1937, a few weeks before they received Scott & Williams' letter of October 14, 1937, the annual meeting of the Southern Hosiery Manufacturers' Association had been held at Asheville, N. C. Notices of the meeting had announced that a special session would be devoted to a consideration of the claims of the Elastic Patents Company for royalties on attachments for laying in elastic in ribbed goods. The notices referred to pending applications for patents covering automatic elastic top stockings both for the fabric and for machines, and stated that the owners of the patents would attend the meetings and discuss the situation. The meeting was held and was attended by a large number of half hose manufacturers and machinery men. Robert E. Davis, the inventor of the Davis patent '246 in suit, discussed his patents on elastic rib top for half hose, Nos. 2,089,879 and 2,089,890, which had been issued to him on August 10, 1937. He stated that the patents had been conveyed to the Elastic Patents Company as a holding company to which in the future manufacturers of such hosiery would be required to pay a royalty of 2¢ per dozen pairs. He explained, however, that these patents did not refer in any way to automatic or crinkle tops for stockings for which applications filed by him were then pending in the Patent Office, and that he had granted to Interwoven an exclusive license to use the last mentioned inventions in the manufacture of men's hose at a royalty of 4¢ per dozen pairs and that interested manufacturers must negotiate with that company.

J. E. Baker, the president of the defendants' companies, attended this meeting and heard the discussion. He was appointed chairman of a committee to deal with the questions of patents on laid in elastic and in the following October attended a meeting of the Hosiery Industry Conference in New York and made a report. The committee reached an agreement with the holders of

the patents '879 and '890 for a royalty of 2¢ per dozen pairs, and made a report to the industry recommending that interested manufacturers accept a license on this basis. Full accounts of the meeting of the Southern Hosiery Mfrs. Ass'n in Asheville and of the action of the committee were reported in trade journals devoted to the textile industries and widely circulated amongst manufacturers interested in the patents in suit.

The knowledge of the defendants of these activities and their attitude toward the patent situation is further shown by letters which they wrote to Scott & Williams in 1937 and August, 1938 in which Mr. Baker stated that for the time being his mills were not interested in the laying in attachment of Scott & Williams and that they did not intend to do anything about the matter until it was determined what would become of the crinkle top patent then pending, which later became the Davis patent '246.

The defendants, however, in March, 1939, did acquire from Scott & Williams through another mill, whose account it guaranteed, 22 out of a lot of 35 crinkle top attachments which would enable knitting machines to produce infringing stockings. At that time Scott & Williams' interest in the patents in suit was confined exclusively to the ownership of the Gastrich patent and an option to buy the Getaz patents, subject to Interwoven's rights therein.

In the latter part of 1939, or early 1940, the defendants also bought 26 Scott & Williams knitting machines equipped with dial and cylinder needles for the manufacture of rib top stockings, and also equipped with rubber laying in attachments for the production of rib knit tops, which were covered by the Gastrich patent. Mr. Baker was still apprehensive that his companies might become involved in patent litigation, and before accepting delivery of the machines secured a letter from Scott & Williams in June, 1939, in which Scott & Williams assured him that the machines would not infringe existing patents and if suit should be brought against the defendant companies, Scott & Williams would defend it. After the machines were delivered, the defendants without consulting Scott & Williams, of their own motion altered the machines by removing the dial needles so that the machines could be used to make plain elastic top hosiery which infringed the other patents in suit.

The machines, however, were not satisfactory in other respects and by arrangement with Scott & Williams were sent back in the latter part of 1940 in lots of four or five at a time to be rebuilt. The return was accompanied by a letter of November 5, 1940, in which Scott & Williams were instructed not to make any change in the pattern set up. Consequently the rubber attachment as altered by the defendants was not disturbed, and the machines were returned to the defendants so that they were capable of producing plain knit infringing elastic top stockings.

Prior to the time when the 26 machines were acquired as aforesaid, Scott & Williams had notified Getaz that it had decided to exercise its option to acquire his patents, but the notice was coupled with a request for an extension of the option and it does not appear that the option was actually exercised or that Scott & Williams acquired a control of the Getaz patents until the Davis Company was formed in 1946 and acquired all the patents in suit. At that time there was an agreement between Scott & Williams and Getaz, and the latter joined in the conveyances to the Davis Company. It is important to note that even the Scott & Williams option was subject to Interwoven's exclusive licenses to make men's hose under the Getaz patents so that Scott & Williams was never in a position to grant a license to make men's hose under these patents. It is also well to bear in mind that the defendants' stockings, which were found by the District Judge to infringe the patents in suit, were not made on Scott & Williams' machines above mentioned.

The contention that the defendants acquired an implied license is based largely on these incidents which relate only to 48 Scott & Williams machines and attachments out of some 400 machines in the defendants' plants. The defendants not only altered the 26 Scott & Williams machines but of their own initiative equipped the

machines in their factory with other attachments not manufactured by Scott & Williams which enabled the defendants to make infringing stockings. They say that they acquired an implied license because Scott & Williams did not warn them not to use the attachments and the machines for infringing purposes, but there is testimony that the official who handled these matters was not familiar with the patent situation, and that it was the company's practice to warn customers that they might get into trouble if they used rubber in stocking tops except those composed of rib fabric.

It is plain from this review of the testimony that the defendants were not misled as to the patent situation or encouraged by Scott & Williams to violate the patents in suit, and that in fact Scott & Williams had no control over the Getaz patents to grant licenses. The defendants had been warned in writing by Scott & Williams as to the pending patents and had been informed at meetings of the trade association and the investigating committee that the owner of the Davis patents would hold them liable for unauthorized use of the invention. The District Judge was fully justified in reaching the conclusion that the defendants deliberately infringed, after facts had come to them which gave them notice that patents were pending or had been granted. The defendants were fully protected by the statement in the opinion of the court that in assessing damages it may be necessary to reexamine the evidence to ascertain whether the defendants utilized without alteration any Scott & Williams' machines under an implied license to make infringing stockings. There is nothing in the decree before the court which prevents such an investigation.

There is reference in the testimony to dealings between Scott & Williams and a few other knitting mills, but it is too insignificant to warrant discussion in this opinion.

The evidence that Robert E. Davis encouraged the infringement of the patents is even more tenuous. It refers to dealings between W. B. Davis & Son, Inc. in 1935 and 1943, with Adams-Millis Corp., a large manufacturer with a factory in North Carolina and offices in Chicago and New York. On October 29, 1935, Davis gave this company permission to make automatic top hosiery except men's hose under his pending patent and promised to send a license agreement specifying a royalty of 2½¢ a dozen. Men's hose were excepted because of the license to Interwoven previously granted. Davis, however, did not follow the matter up and collect the royalties because soon afterwards he was involved in the interference proceeding in the Patent Office and his patent was held up. In October, 1943, after the patent was issued, he granted a license to the Adams-Millis Corp. and collected royalties in the sum of $1,169.94. Still later, on October 18, 1944, he paid back this amount by a check marked "return of royalties until adjustment." This step was taken after an address by the President of the Interwoven Company at a meeting of the Southern Hosiery Mfrs. Assn. in which he indicated that Interwoven would surrender its exclusive license and consent to a licensing of the whole industry. Adams-Millis Corp. requested the return of the money because it appeared that other manufacturers were infringing the patents without payment of royalties and Davis thought that it was fair to return the money until an adjustment could be made. Adams-Millis Corp. is now a contributor to the defense of the pending suit.

The evidence relied on to show that Interwoven knowingly encouraged manufacturers to infringe the patent is confined to two points. (1) It maintains a museum in which it collects specimens of stockings made by its larger competitors in the United States and Europe, and as a rule is familiar with the goods produced by the industry. (2) Interwoven owns machinery in other mills and employs them to make stockings for its account which are later finished in its own plant. In 1939 it engaged Adams-Millis Corp. to make *elastic* top stockings for it, using Adams-Millis equipment for the purpose. That company at the time was making similar goods for others, but the evidence does not show whether Interwoven was aware of this fact. Obviously

the Adams-Millis Corp. was not encouraged to violate the patents by these circumstances. It was common knowledge in the industry in 1939 that Davis had patents pending in 1939 and that Interwoven had a license to operate under the patents. Adams-Millis itself recognized the patent by arranging to take a license in 1935 which was prevented by the interference proceedings in the Patent Office, and later Adams-Millis actually took a license from Davis and paid royalties as hereinbefore stated.

A significant announcement with regard to the rights of the patentees and the opportunity for all manufacturers to operate under the patents was made in September, 1944, at the meeting of the Southern Hosiery Mfrs. Assn. at Roanoke, Va. The president of Interwoven made an announcement which was given wide publicity in the trade journals in October, 1944, that Interwoven had relinquished its sole rights in the Davis patents and that an arrangement could then be made by manufacturers to operate equipment which was designed for the manufacture of the patented goods and all persons interested in the patent rights covering machine and fabric were notified that they could negotiate with the firm of Robert E. Davis. It was noticed that the announcement came at a fortunate time since the industry was preparing for the return of rubber in hosiery tops of which it had been deprived during the previous years on account of the war.

Violation of Federal Anti-Trust Statutes.

The defendants go on to contend that the beneficial owners of the patents, having lulled the industry into a sense of security in infringing the patents, joined forces in a conspiracy in violation of the federal anti-trust laws to pool the patents and mulct the infringing manufacturers in damages. We have seen that there is no substantial foundation for the first position and it remains to consider whether the evidence supports the second. It is based upon the formation of the Davis Company in 1946 by W. B. Davis & Sons, Inc., Interwoven and Scott & Williams to hold the patents in a single ownership, and upon the assertion that the patents provide essentially competing methods and fabrics covering the whole field of automatic elastic top hosiery, and hence the Davis Company is the fruit of an unlawful conspiracy in violation of Sections 1 and 2 of the Sherman Act as amended, 15 U.S.C. A. §§ 1 and 2.

The Davis Company was incorporated under the laws of Maryland. As of August, 1946 it received assignments of the patents in suit and of nine other patents not here involved as follows: The Gastrich patent '486 was assigned by Scott & Williams, subject to the right of Scott & Williams to manufacture knitting machinery for hosiery covered by the patent and subject to the exclusive right of the Textile Machine Works to operate under the patent in the field of full fashioned hosiery. The four Getaz patents in suit, with two other Getaz patents not here involved, were assigned by James L. Getaz and Scott & Williams, who had effected an agreement with Getaz to accomplish the assignment, subject to a license to Interwoven to use these patents in the field of men's hosiery. The Davis patent '246, as well as two other patents of Robert E. Davis and one patent of Robert E. Davis, Jr. not here involved, were assigned by W. B. Davis & Son, Inc., subject to an exclusive license possessed by Interwoven to use the patents in the field of men's hosiery. Interwoven transferred its interest as exclusive licensee under the Davis and Getaz patents as above described, and also its interest as owner of four patents issued to Robert E. Davis, Jr. not in suit. Interwoven, however, reserved from the grant the exclusive right to make men's hosiery in which an elastic thread is incorporated in the self-supporting portion only at every fourth wale in every fourth course.

The Davis Company began to circularize the industry before the transfer to it of all the patents was perfected. Offers to license the industry under all of the fifteen patents at 2¢ per dozen pairs were made in February, 1946 and repeated in August and September, 1946, and in the last mentioned communication the beginning date for the payment of royalties was fixed at September 1, 1946. Attention was drawn to the saving of 15 to 20¢ per dozen pairs by adopting

the methods and fabric of the patents. These communications led to the formation of the Investigating Committee which in turn circularized the industry and solicited the manufacturers to furnish the number of their seamless machines in operation with or without rubber attachments and requested the manufacturers to join in fighting the patents and to contribute according to the number of machines operated. A copy of these circulars came into the possession of the Davis Company which offered the Committee in a number of letters to furnish any information which the Committee desired in respect to the patents, but this offer was rejected.

The license offered by the plaintiff in 1946 contained no restrictions as to the quantity of goods to be produced, or the price to be charged, or the territory in which they might be sold by the licensee. There were no tying clauses of any character, no pyramiding of royalties, and no requirement that the inventions must be used. The license was specifically confined to the type of manufacture of plain circular knit hosiery, embodying one or more of the inventions, expressly excepting, however, the right to make the character of goods reserved to the Interwoven Company.

The defendants argue that the conditions of the license offered in 1946 tending to establish their charge that the plaintiff set up a monopoly of competing patents on three grounds, namely: (1) that the licensee agrees that he will not at any time contest the validity of any of the patents covered by the license; (2) that the licensee is required to take a license for all fifteen patents at 2¢ per dozen pairs, and may not obtain a license under a smaller number of patents at a smaller royalty; (3) that the term of the license extends to the end of the term of the last expiring patent whereby the terms of earlier patents would be extended beyond the statutory period. For example, the earliest patent, Getaz '217, expires September 15, 1953, and the latest Getaz patent '350, expires March 14, 1961. Another criticism of the license offer is that under it royalties are payable even though the manufacturer may already have an existing license; but it is not clear why such a manufacturer would need an additional license.

The first objection requires no comment since it refers to a condition which is imposed by law upon every one who takes a license under a patent. See Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999. The other objections would be worthy of more attention were it not for the fact that they were eliminated from the plaintiff's offer to license the industry in a communication which was sent out on December 24, 1948, after the pending suit was brought but before it was tried in the District Court. Three forms or types were offered by the plaintiff company in this communication: (1) a license under the Davis patent '246 and the Getaz patent '350 which would authorize the licensee to make a plain knit stocking top with elastic thread in spaced courses and wales, under the first mentioned patent, and also to include a selvage or anti-ravel edge under the second mentioned patent; (2) a license under the Getaz patents, '402 and '350 which would enable the licensee to produce a plain knit stocking having the appearance of a rib knit stocking under the first mentioned patent, and to give it the selvage under the second mentioned patent; and (3) a license under the Davis patent '246 and also under another Davis patent No. 2,183,862, not in suit, which would authorize the licensee to manufacture the top portion of the stocking with terry knit fabric so made as to substantially conceal the elastic thread.

In the proposed new license agreement offered by the Davis Company, no restriction is found on the use of the Davis patent '246 since Interwoven had previously surrendered its exclusive right to incorporate the rubber at every fourth wale in every fourth course. As a result, Interwoven is subject to the same royalty, as other manufacturers.

Furthermore the Davis Company did not confine its offer to the three types or combinations of patents above described. It announced in the same offer that the company stood ready and willing to negotiate the grant of uniform licenses at reasonable royalty rates for any other type of automatic elastic top hosiery comprehended by

the claims of the patents owned by it. The provision in the earlier offers that the term of the license should extend to the end of the last expiring patent was also eliminated. The Davis Company also met the other objection to its previous license offers by announcing that if any hosiery manufacturer had acquired a license either express or implied under any of the patents owned by it for all or any part of its production, and this license was established to the satisfaction of the company, it would be recognized.

The Investigating Committee promptly countered this new offer of the plaintiff by a communication to the industry advising the rejection of the offer and stating that the Committee and its counsel were prepared to resist the suit on the ground that the pooling of the patents was invalid under the anti-trust laws.

We shall discuss this aspect of the case in connection with the latest offer of the plaintiff to license hosiery manufacturers since it was conceded by plaintiff's attorney in the argument of the case that the plaintiff's claim for damages for infringement must be confined to the period subsequent to December 24, 1948, when the last offer was made, and restrictions upon the license offered in 1946 were withdrawn.

The defendants depend very largely upon their assertion that the gathering of the six patents into one ownership suppressed competition between methods and fabrics which would otherwise contest with one another in the industrial field. The facts, however, do not bear out the contention. It is true that the plaintiff in its offer spoke of the fifteen patents as a comprehensive and complete series covering the various improvements of plain knit elastic top self-supporting hosiery and there is testimony to the effect that stockings may be made either according to the Davis or the Getaz method, some mills using one and some the other. But it was held by the District Court, and the evidence supports the holding, that the patents are complementary rather than competitive. It was shown by the evidence of witnesses who were associated with certain mills which contributed to the defense that they were making stockings whose fabric embraced not only Davis' spaced courses but the Getaz selvage edge and true rib appearance as well. Moreover, certain of the stockings produced in evidence and stipulated to have been made by the defendant mills were so constructed as to violate both the Davis and the Getaz patents. Interwoven found it desirable from the beginning to incorporate and combine the several features of these patents in their goods and to this end took licenses from both Davis and Getaz. Thus the evidence clearly shows that a stocking which has the appearance of the popular rib top, the selvage edge, and the elastic in spaced courses is recognized as a superior article by the trade.

It will have been observed that we are not dealing in this case with members of an industry who have been injured by a monopoly established by strongly entrenched and powerful competitors. It is said that there are five or six hundred independent hosiery mills in this country, and nowhere in this case does it appear that free competition has been stifled or that any attempt has been made to control the producers as to prices or quantities or areas of production. Furthermore, the patent privileges have been offered freely to all manufacturers and it is to their obvious advantage to possess the right to incorporate in their output all the modern improvements in the manufacture of hosiery.

Nor can there be any reasonable complaint as to the amount of the royalty received. There is no evidence to indicate that it is excessive in amount and there is the fact that for a considerable period Interwoven, the largest manufacturer of all, paid 4¢ a dozen pairs for the right to use the Davis patent '246 alone and that at another period, the Adams-Millis Corporation paid a royalty of 2½¢ per dozen pairs under the same patent. The only advantage which the owners of the Davis Company possess is the right to exact a royalty fee for the use of the patents; but this is the privilege which the statute grants to inventors and to those who acquire patents from their owners and promote them; and the combination of complementary patents in a single ownership is not illegal if the combination is not used for improper pur-

poses. United States v. United Shoe Machinery Co., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; United States v. Winslow, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481; Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926.

The defendants and their associates cannot complain of hardships heretofore imposed upon them. Not only have they paid no royalties for the use of the inventions, but they have defied the owners of the patents and are now contending that even if they are infringers, they cannot be required to pay damages since the plaintiff does not come into court with clean hands. In considering this aspect of the matter it is important to bear in mind that much of the defendants' argument relates to the original licenses offered to the trade which were materially changed in 1948. We think that the case should be decided on the basis of the last offer, for even if the first offer was improper, the plaintiff was clearly within its rights in withdrawing and correcting it. Campbell v. Mueller, 6 Cir., 159 F.2d 803; Flexwood Co. v. Matt G. Faussner & Co., 7 Cir., 145 F.2d 528; Sylvania Industrial Corp. v. Visking Corp., 4 Cir., 132 F.2d 947, 958.

The defendants, however, contend that even the present attitude of the plaintiff is unlawful, and hence it is deprived of the right to any relief. For this position they rely chiefly upon the recent decisions of the Supreme Court in Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, and United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. An examination of these cases clearly shows their irrelevancy to the present case. In the Hartford-Empire case a combination of corporations and of patents owned by them enabled the defendants to dominate the automatic manufacture of glass in this country; and the control of the patents was used to exclude other manufacturers from an opportunity to engage in the businesses and processes encompassed by new inventions. The defendants were able to allocate certain fields in glassware manufacture, to control the amount of production therein, and to maintain prices both as to the goods covered by the patents and as to other unpatented products.

The Supreme Court summarized the findings of fact of the trial court in this case in these words, 323 U.S. at page 400, 65 S.Ct. at page 381, 89 L.Ed. 322: "The district court found that invention of glass making machinery had been discouraged, that competition in the manufacture and sale or licensing of such machinery had been suppressed, and that the system of restricted licensing had been employed to suppress competition in the manufacture of unpatented glassware and to maintain prices of the manufactured product. The findings are full and adequate and are supported by evidence, much of it contemporary writings of corporate defendants or their officers and agents."

It was the unlawful character of these activities, which are in strong contrast with the free and independent competition existing in the hosiery industry, that led the Supreme Court to affirm the conclusion of the District Court that the leaders of the glass industry had violated the Sherman Act. The court said, 323 U.S. at pages 406–407, 65 S.Ct. at page 384:

" 'Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights a universal license against positive prohibitions. The Sherman law is a limitation of rights,— rights which may be pushed to evil consequences and therefore restrained.'

"The difference between legitimate use and prohibited abuse of the restrictions incident to the ownership of patents by the pooling of them is discussed in Standard Oil Co. v. United States, 283 U.S. 163, 51 S. Ct. 421, 75 L.Ed. 926. Application of the tests there announced sustains the District Court's decision. It is clear that, by cooperative arrangements and binding agreements, the appellant corporations, over a period of years, regulated and suppressed competition in the use of glassmaking machinery and employed their joint patent position to allocate fields of manufacture and to maintain prices of unpatented glassware."

The Paramount case is especially relied on by the defendants to show that not only the first but also the last offer of the plaintiff involves an illicit attempt to control the industry. In that case the Supreme Court found that certain distributors and exhibitors of motion pictures had been engaged in an unlawful restraint of trade in that they had eliminated competition both in the distribution and exhibition of feature pictures by establishing substantial uniform minimum admission prices, by maintaining a system of clearances designed to protect a particular run of film against a subsequent run, and by pooling agreements whereby joint ownership and sharing of profits from normally competitive theatres were directed. The court especially emphasized and condemned one practice whereby the opportunity to purchase the right to exhibit one picture of good quality was conditioned upon purchasing another picture of inferior rank, thus endowing the latter with an earning power beyond its true merit. In discussing this feature the court said, 334 U.S. 156–159, 68 S.Ct. 929, 92 L.Ed. 1260:

" * * * Block-booking prevents competitors from bidding for single features on their individual merits. The District Court held it illegal for that reason and for the reason that it 'adds to the monopoly of a single copyrighted picture that of another copyrighted picture which must be taken and exhibited in order to secure the first.' That enlargement of the monopoly of the copyright was condemned below in reliance on the principle which forbids the owner of a patent to condition its use on the purchase or use of patented or unpatented materials. * * * The court enjoined defendants from performing or entering into any license in which the right to exhibit one feature is conditioned upon the licensee's taking one or more other features.

"We approve that restriction. The copyright law, like the patent statutes, makes reward to the owner a secondary consideration. In Fox Film Corp. v. Doyal, 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010, Chief Justice Hughes spoke as follows respecting the copyright monopoly granted by Congress 'The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.' It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius. But the reward does not serve its public purpose if it is not related to the quality of the copyright. Where a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other. The practice tends to equalize rather than differentiate the reward for the individual copyrights. Even where all the films included in the package are of equal quality, the requirement that all be taken if one is desired increases the market for some. Each stands not on its own footing but in whole or in part on the appeal which another film may have. As the District Court said, the result is to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses.

*   *   *   *   *   *

"We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted."

The defendants in the instant case liken this compulsory block-booking of motion pictures to the offers of the Davis Company to the knitting industry in 1946 in which fifteen patents were combined, and contends that the condemnation of the Paramount case should also be applied to this practice. The case was decided in May, 1948, and the decision undoubtedly led the plaintiff to modify its first offer and to send out a new offer in this connection to the industry in December of that year. Therein it eliminated the requirement that a licensee must accept a license under all of the patents and in place thereof offered patents in suitable groups of two and left the door open to any proposal for the acquisition of patent rights by the announcement that the Davis Company stands ready and willing to negotiate for uniform licenses at reasonable rates for any other type of automatic elas-

tic top hosiery comprehended by the plaintiff's patents. Such a general offer was held sufficient in Sbicca-Del Mac, Inc. v. Milius Shoe Co., 8 Cir., 145 F.2d 389, to disprove the charge that a prospective licensee must accept a blanket license covering a number of patents and could not obtain a license under a single patent.

The Davis Company in the new offer also eliminated the provision as to the expiration date of the license. Theretofore in order to justify its requirement that a license taken by a manufacturer should last until the expiration of the youngest patent in the group, it had relied upon the rule announced in such a case as E. R. Squibb & Sons v. Chemical Foundation, 2 Cir., 93 F.2d 475, 477, that if the contract between the parties expressly so provides, royalty payments may be collected after the expiration of the patent. Such a provision, however, might easily lend itself to an unreasonable restraint of trade by extending patents beyond their legal limit; but it has been eliminated in the pending case and need no longer be considered.

We are in agreement with the conclusion of the District Judge that the proofs in this case negative the existence of any conspiracy on the part of the plaintiffs, its officers and its predecessors, to violate the anti-trust statutes of the United States, and that the patents are enforceable against the combined infringers represented by the Hosiery Investigating Committee in control of the defense of the suit. The case will be remanded for further proceedings, which will include the modification of the decree so as to eliminate the Gastrich patent, as to which no infringement has been shown, and the determination of the liabilities of the defendants for infringement of the other patents in suit.

A motion of the appellants for a stay of proceedings was filed in this court on January 6, 1950, a few days before the argument. The motion brought to our attention a suit filed by the United States on December 28, 1949, in the District Court of the United States for the Southern District of New York against the Davis Company, W. B. Davis & Son, Inc., Scott & Williams, Inc., Interwoven Stocking Company and others

in which the defendants therein were accused of violating the Sherman Act by conspiring to restrain commerce in elastic top hosiery, and the plaintiff prayed that the defendants be perpetually enjoined from so conspiring and for other relief. The motion for stay of proceedings is denied.

The decree of the District Court as modified will be affirmed.

Modified—Affirmed.